## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SHAYNA AMREIN,** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | )    Civ. No. |
| v. | ) |
| | ) |
| | ) |
| **JANET YELLEN,** | **)** |
| **Secretary of the Treasury** | ) |
| | ) |
| Serve: *Janet Yellen, Secretary* | ) |
| U.S. Treasury | ) |
| 1500 Pennsylvania Ave. NW | ) |
| Washington, D.C. 20220 | ) |
| | ) |
| *Phillip R. Sellinger, Esq.* | ) |
| Office of the United States Attorney | ) |
| Attention – Civil Process Clerk | ) |
| 970 Broad Street, 7th Floor | ) |
| Newark, NJ 07102 | ) |
| | ) |
| *Merrick Garland, Esq.* | ) |
| United States Attorney General | ) |
| c/o Department of Justice | ) |
| 950 Pennsylvania Avenue, N.W. | ) |
| Room B-103 | ) |
| Washington, D.C. 20530-0001 | ) |
| | ) |
| Defendant | ) |
| | ) |

## COMPLAINT

1.      This is an action against Janet Yellen, the Secretary of the Treasury, in her official capacity for monetary damages and equitable relief for injuries Plaintiff Shayna Amrein sustained as a result of the Defendant's discriminatory and retaliatory conduct.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this controversy pursuant to 28 U.S.C. §1331, and 42 U.S.C. §2000e-16(a) and (c) (Employment by Federal Government).  Venue is appropriate in New Jersey because all the discriminatory acts occurred in New Jersey.

3.      Plaintiff has exhausted her administrative remedies in that she is filing this lawsuit within 90 days of her receipt of the Final Agency Decision in EEOC case number 520-2022-00402X.  29 C.F.R. §1614.407.

## PARTIES

4.      Ms. Amrein resides at 16 Skylark Drive, Jackson, NJ 08527.  Ms. Amrein is a Special Agent with the Internal Revenue Service, Criminal Investigation.

5.      Defendant Janet Yellen is the Secretary of the Department of Treasury.  She is being sued in her official capacity.  (Defendant is referred to as Defendant, the Agency or Management.)

## FACTS

6.      Ms. Amrein is a Special Agent (SA), GS-1811-13, Criminal Investigation (CI), Northern Field Operations, Newark Field Office, at the Internal Revenue Service (IRS), with a post of duty in Trenton, New Jersey.

7.      Among other things, Ms. Amrein investigates tax crimes and when necessary, conducts search and arrest warrants.  She carries a weapon as part of her duties.

8.      Ms. Amrein began working for the IRS in January 2007.

9.      Ms. Amrein was and is qualified for her position as evidenced in annual performance reviews.

10.     The majority of Special Agents in Ms. Amrein's workplace are male. When she was sexually assaulted, she worked out of the Edison, NJ post of duty (POD). All Special Agents in the Edison POD were male except Ms. Amrein who is a female.

11.     At the Trenton location, out of the nine Special Agents, six were male, and three were female. One of the three females was the wife of one of the male Special Agents and was the sister-in-law of Michael Montanez, the Special Agent in Charge of the Newark Field Office at that time.

12.     Ms. Amrein was sexually assaulted by a fellow Special Agent, "G", during a work-related event on August 15, 2017. The assault, which consisted of three discrete incidents of assault that evening, was witnessed by one co-worker, who conceded to seeing the first incident of the assault.

13.     The co-worker asked if Ms. Amrein wanted him to talk to "G", but Ms. Amrein believed that since she strongly rejected him, he would not continue. Unfortunately, "G" assaulted her two more times when others had walked away from Ms. Amrein, and no other co-worker admitted to seeing the assaults.

14.     Ms. Amrein learned through other employees that "G" had committed a sexual assault on another employee three years earlier at the same work function, and management was aware of that assault.     This victim was in Ms. Amrein's office on September 1, 2017, and Ms. Amrein asked her if "G" assaulted her. This victim confirmed

that he did and told her the details of that night and subsequent information related to the assault, including that management dissuaded her from filing anything against "G".

15.     On September 1 and 5, 2017, Ms. Amrein disclosed the assault to Supervisory Special Agent (SSA) Robert Erickson, who was the SSA in her Edison POD, and on September 5, 2017, to Special Agent in Charge Jonathan Larsen.  Both of these supervisors encouraged Ms. Amrein to utilize the services of the Employee Assistance Program.

16.     IRS management referred the matter to the U.S. Treasury Inspector General for Tax Administration (TIGTA).   TIGTA provides independent oversight of IRS activities.

17.     On September 6, 2017, Ms. Amrein met with investigators from TIGTA at their office in East Brunswick, NJ concerning the "G" assault.  TIGTA initiated a criminal case into Ms. Amrein's allegations against "G".

18.     The TIGTA investigation went on for several months and led to a referral for a criminal prosecution to the U.S. Attorney's Office for the Eastern District of New York.

19.     As the TIGTA investigation proceeded, the Agency treated Ms. Amrein in an adverse manner.  For example, for her mid-year review in September 2018, there were multiple statements that made her sound as if she was not a capable agent.  Special Agent in Charge Tafur agreed it needed to be changed.  Later SAC Tafur stated the SSA Erickson changed the mid-year in order to exclude information that should not be in the evaluation, but the new evaluation was still problematic.  In October 2018, Ms. Amrein's superiors discussed a possible relocation from Edison because of tension with SSA Erickson.

However, Ms. Amrein raised several reasons including medical reasons and family reasons why a change of job locations would not be helpful, plus, reiterated that SSA Erickson's SSA position was coming to it's close and a new SSA would be taking over in December 2018 or January 2019.

20.     Thereafter, the Agency retaliated against Ms. Amrein for objecting to sexual harassment, i.e. the "G" assault, when management forced her to close four of her cases and made her work with friends of "G" (e.g. had vacationed with him), reassigned her to an undesirable work location, which was comprised by more than 50% of "G's" friends, and presented her with a lowered job evaluation.  Due to the increased stress from working in that environment, Ms. Amrein was able to get a letter from her cardiologist expressing the concern that the environment was creating stress which directly impacted Ms. Amrein's atrial fibrillation.   Ms. Amrein submitted this letter with a reasonable accommodation request and was moved to the Trenton POD – Ms. Amrein's 3rd choice for an office.

21.     Ms. Amrein pursued her rights under the Equal Employment Opportunity laws in case EEOC No. 520-2019-00616X.  Following discovery, the parties settled this matter in a written agreement in or around July 2020.

22.     Following the settlement, the prosecution of "G" continued.  It was known amongst Defendant's employees that Ms. Amrein would be the key witness in the prosecution of "G".  Further, other employees would be called as potential witnesses.

23.     "G" was well liked at the Agency and had many friends.  For example, in June 2020 Special Agent in Charge Michael Montanez became the SAC of the Newark field office, which included Trenton.  SAC Montanez was friends with "G", had vacationed

with him and was well aware of Ms. Amrein's complaints about "G" to include, but not be limited to, her EEO activity as described above.

24.     In this regard, TIGTA advised Amrein to avoid direct interactions with "G's" friends, which included SAC Montanez.

25.     Following the EEO settlement, Ms. Amrein continued to work in the Trenton POD.

26.     SAC Montanez professed knowing the amount at which Ms. Amrein's EEO complaint settled.

27.     Ms. Amrein reported to Supervisory Special Agent Michael Pohar who, in turn, reported to ASAC Rosado-Espinal and SAC Montanez.

28.     SAC Montanez, when he was working in the Springfield, NJ POD as an analyst (prior to his selection as SAC) questioned Ms. Amrein about the assault and retaliation she had endured when she was transferred to the Springfield POD in January 2019.

29.     SSA Pohar was aware of Ms. Amrein's EEO activity because Ms. Amrein was transferred to the Trenton POD with him as SSA due to the reasonable accommodation Ms. Amrein had filed to be removed from the Springfield POD.

30.     In August 2021, HR advised Ms. Amrein that she was required to get the COVID vaccine by November 2021.

31.     On September 20, 2021, Ms. Amrein received the first dose of the Moderna vaccine and had an adverse reaction, i.e. dullness of feeling sensation (touch). Ms. Amrein could not feel pain but could feel pressure.

32.     Ms. Amrein contacted SSA Pohar, her supervisor at the time, on September 20, 2021, to inform him she had an adverse reaction.

33.     SSA Pohar responded that he hoped Ms. Amrein felt better.  SSA Pohar never suggested Ms. Amrein should be placed on temporary restricted duty (TRD).

34.     On September 23, 2021, Ms. Amrein's neurologist examined Ms. Amrein and told her that her test results were normal and Ms. Amrein did not have to limit any normal activities.  Ms. Amrein informed SSA Pohar.

35.     Ms. Amrein had her annual physical assessment for work on September 24, 2021 and she completed all necessary tasks with no difference compared to prior years.

36.     SSA Pohar said there was no need for Ms. Amrein to re-qualify for firearms assessment.

37.     Ms. Amrein subsequently flew armed to California for work and back. Ms. Amrein also testified in grand jury on September 29, 2021.

38.     At the end of September, management did not have any issue with Ms. Amrein's ability to do Ms. Amrein's job.

39.     On October 1, 2021 Ms. Amrein contacted SSA Pohar via e-mail. Ms. Amrein stated Ms. Amrein was considering filing a workers' compensation claim because of the adverse reaction to the Agency required vaccine, since no long term effects were known at that time, but the claim needed to be filed timely as a precaution.

40.     SSA Pohar said he needed to check with ASAC Lani Rosado-Espinal and SAC Michael Montanez.

41.     This would have been the first time SAC Montanez became aware that Ms. Amrein had an adverse reaction to the first dose of the COVID vaccine.

42.     SSA Pohar then called back and told Ms. Amrein per the front office (i.e. SAC Montanez) he was placing Ms. Amrein on Temporary Restricted Duty (TRD) effective immediately.

43.     Management's discriminatory and retaliatory decision to place Ms. Amrein on TRD occurred shortly after recent activity on Ms. Amrein's sexual assault case referenced above. (Employees involved in this matter were brought into the Grand Jury around the same time Ms. Amrein received the mandatory vaccination.)

44.     "G" was charged on November 30, 2021 in the Eastern District of New York.  He surrendered in the District of New Jersey on December 1, 2021.

45.     Ms. Amrein questioned the reasons for TRD to SSA Pohar and he included Acting ASAC Lani Rosado-Espinal on the email. Ms. Amrein offered, for the second time, to qualify with her firearm to further prove that her adverse reaction did not inhibit her control or accuracy with her firearm, and included the duties she had successfully performed without issue for the two weeks after the adverse reaction occurred, along with the verbal clearance Ms. Amrein received from the neurologist.

46.     TRD restrictions included loss of government issued firearm, loss of driving a Government Owned Vehicle, not being allowed to serve arrest / search warrants, and not being allowed to interview people in higher risk areas.

47.     SSA Pohar denied Ms. Amrein's request.

48.     When Management placed Ms. Amrein on TRD, she was part of a highly sensitive investigation in which victim interviews were needed in multiple states.  Due to TRD status, Ms. Amrein was not permitted to travel or assist on these interviews, resulting in the other team members to take on those responsibilities.

49.     Management unnecessarily delayed issuance of a TRD letter from the medical review officer addressed to SAC Montanez, to Ms. Amrein.

50.     On October 11, 2021 Ms. Amrein emailed SSA Pohar and Acting SSA Brad Jones (SSA Pohar was to be on leave the following day) regarding ride status for testifying in a Grand Jury in Newark.

51.     Because of TRD status, Ms. Amrein was not allowed to drive.

52.     In this email, Ms. Amrein stated that Ms. Amrein had yet to receive her TRD letter. In a phone conversation after getting placed on TRD, SSA Pohar told Ms. Amrein not to worry about rides and that it would be coordinated. In this email, Ms. Amrein informed Brad Jones that Ms. Amrein had not heard from anybody and Grand Jury was two days away.

53.     Ms. Amrein heard back from SSA Pohar claiming that he was not aware of coordinating rides and "I'm sure you can take care of this yourself." As a result, with such short notice, Ms. Amrein had to send an email to the entire group of co-workers informing them that she was on TRD and needed ride assistance. Ms. Amrein felt humiliated.  In having to explain her situation Ms. Amrein would be violating her privacy.

54.     The unjustified TRD was negatively affecting Ms. Amrein's cases.

55.     Because Management would not let her drive, an agent had to drive from their house, to Ms. Amrein's house, then drive to Newark (or other destination), then back to Ms. Amrein's house, and finally back to their home.  From Ms. Amrein's house to Newark (without traffic) it takes approximately an hour and 10 minutes each way.

56.     The need for rides were all work-related events.  Originally, Ms. Amrein needed a ride to testify in grand jury to obtain an indictment.  Then Ms. Amrein needed a

9

ride to attend a meeting with her AUSA, his 1st level supervisor and his criminal chief. Ms. Amrein also needed rides to conduct interviews of witnesses on a newer investigation. Lastly, Ms. Amrein needed a ride to attend a meeting with the case team at the USAO.

57.     On October 13, 2021 Ms. Amrein finally received her TRD letter, after asking several times what she was being restricted from and why. Ms. Amrein noticed in the email chain that SAC Montanez received this letter on October 7, 2021, and did not get it to Ms. Amrein even though Ms. Amrein was asking for it prior.

58.     During one of the calls with SSA Pohar during this time, Ms. Amrein notified him that she may have to file an EEO Complaint - he laughed.

59.     On October 20, 2021 Ms. Amrein submitted her medical exception request along with Ms. Amrein's reasonable accommodation request not to take the second dose because of the initial adverse reaction to the first dose.

60.     SSA Pohar questioned Ms. Amrein on the phone on why Ms. Amrein would file a reasonable accommodation. Ms. Amrein informed him that she was advised to do so by a FLEOA attorney, plus, Ms. Amrein sent him the IRS Headlines link showing that it was proper procedure.

61.     SSA Pohar did not submit Ms. Amrein's forms until the deadline of October 22, 2021.

62.     On October 21, 2021 regarding the TRD issue, Ms. Amrein sent documents supporting Ms. Amrein not being on TRD to the Medical Review Officer at Comprehensive Health Services (CHS) (there was an issue with the fax and Ms. Amrein eventually sent the documents by carrier). These documents included a letter from Ms.

Amrein's neurologist stating Ms. Amrein was medically qualified to work. CHS received the documents by October 25, 2021.

63.     Over the next few weeks, Ms. Amrein tried contacting IRS representatives at CHS, to no avail.

64.     Ms. Amrein raised her concerns to SSA Pohar, but he said he was not involved and could not do anything to assist.

65.     Finally, on November 16, 2021 Ms. Amrein spoke with a CHS agency representative who said that they didn't know where the UPS package was and they needed the last page from the failed faxes to have all the pages to review. Ms. Amrein emailed the last page (which was the letter from Ms. Amrein's neurologist), and received a response that the submission would be expedited.

66.     On November 23, 2021 Ms. Amrein still had not heard anything from her office, so Ms. Amrein called CHS again. Ms. Amrein was told that her office was notified via email on November 19, 2021.

67.     Ms. Amrein called SSA Pohar and left a message explaining to him that she needed to get back to her full duties, and management's games had caused unnecessary delays. He responded via email that the SAC, ASAC and HQ employee handling Ms. Amrein's TRD, were currently on leave so it would not be dealt with until the earliest of November 29.

68.     Even though Ms. Amrein's SAC was on leave, he still sent out a Thanksgiving message to the Newark field office on Monday, November 22, 2021, from his work email address.

69.     On November 29, 2021 Ms. Amrein finally received her clearance letter, only after HQ contacted SAC Montanez with a cc to SSA Pohar stating that they still did not receive a response of the receipt acknowledgement copy of the RTD (Return to Duty) memo.

70.     This email included the email chain which reflects that SAC Montanez received Ms. Amrein's clearance with a prepared return to duty memo on November 19, 2021. SAC Montanez received this during his normal work hours prior to taking leave, but Ms. Amrein was never advised on the clearance from her agency for ten days.  This was a ten-day delay in Ms. Amrein receiving her clearance.  In other words, Ms. Amrein could have been cleared for full duty ten days earlier than she was.

71.     Managements' actions directly impeded Ms. Amrein's ability to perform her duties as a Special Agent. They were detrimental to Ms. Amrein's cases. Ms. Amrein was unable to participate in interviews of victims in different states. This put pressure on fellow agents and reflected poorly on Ms. Amrein.

72.     An AUSA (V. Grady O'Malley) on two of Ms. Amrein's cases said putting Ms. Amrein on TRD was detrimental to Ms. Amrein's cases.

73.     After inappropriately getting placed on TRD, there were intentional delays by Management that prolonged Ms. Amrein's restrictive duty status.

74.     Ms. Amrein's prior SAC who harassed/retaliated against Ms. Amrein, was also friends with Ms. Amrein's assaulter.

75.     On January 5, 2022, Ms. Amrein filed a formal complaint of discrimination and retaliation with the Defendant's EEO office having made contact with an EEO counselor on November 29, 2021.  (IRS-22-0106-F).

76.     Management was aware of Ms. Amrein's EEO activity.  SSA Pohar was named in the EEO matter.

77.     Later in January 2022, because of her ongoing EEO activity and/or discriminatory motivations, Management interfered with Ms. Amrein's ability to perform assigned duties by attempting to block or delay her issuance of an arrest warrant.

78.     There was an arrest scheduled for January 20, 2022.  This involved a complicated case for a target who was difficult to locate.

79.     On January 13, 2022, a day after the signed arrest warrant was received and coordinated with the other agencies and departments nationwide, Ms. Amrein was preparing for the arrest operation.  Ms. Amrein noticed that the information listed in the field office operations folder known as the "HOP", was not up-to-date for deconfliction with New York.  Ms. Amrein asked SSA Pohar who handles the NY requests.  SSA Pohar offered no assistance, which was not consistent with standard operating procedure.  SSA Pohar's lack of assistance forced Ms. Amrein to contact a DFO analyst and another SSA (who both worked in the NYFO prior to working in the Newark Field Office).  They were able to assist by providing Ms. Amrein a contact in the NYFO; from there Ms. Amrein was directed to three (3) other people, and was able to obtain the proper information needed for this interstate warrant. This was extra work for Ms. Amrein because of SSA Pohar's refusal to assist.

80.     On January 14, 2022, Ms. Amrein sent SSA Pohar the operational package, including her draft ops plan (everything was complete except the attachments of photos, maps and directions).  He responded the next day on a Saturday, questioning Ms. Amrein's due diligence in an email, which raised a potential issue during the discovery process in

the criminal case, and raising issues that were addressed at least four months earlier.  He did not respond to Ms. Amrein's inquiry about procedure with deconfliction in NJ, which Ms. Amrein had to take upon herself to research and process.  Ms. Amrein responded on Sunday morning, needing to lay out everything that was previously addressed so that it was in writing that she did all necessary due diligence.  Ms. Amrein continued to work this holiday weekend, in an attempt to ensure that everything was completed to her best ability to avoid further delays.

81.   SSA Pohar responded on Monday night, back-peddling and deferring the concern of forcible entry to the use of force coordinator.  Again, something that was never raised during the months preceding this arrest.  As ordered, Ms. Amrein sent the use of force coordinator the complete ops plan that night, and discussed the legal matter raised on Tuesday morning.  No issues were seen, and case law was provided which supported forcible entry, if needed.

82.   SSA Pohar was raising issues that had already been dealt with and caused concern of a potential issue with the criminal defense during the discovery process.  He also did not provide any assistance or guidance, which would have resulted in delays if Ms. Amrein did not work extra during off-duty hours (it was necessary since Ms. Amrein was working with the AUSA in order to have the search warrant for the ping, affidavit, etc., completed, along with finalizing the operation package during her normal duty hours).

83.   If Management had successfully delayed the arrest, it would have not only affected Ms. Amrein's case, but all the other agencies and departments working their cases simultaneously.  Because this was a nationally coordinated effort, other states were planning on serving the target after Ms. Amrein had him in custody, and were filing their

legal documents with their courts within a day of the arrest; it needed to happen on the expected date to avoid issues, including notifying the target of additional charges / actions.

84.     SSA Pohar's actions were highly unusual in Ms. Amrein's experience and would not have occurred but for Ms. Amrein's gender and protected activity.

85.     By creating unnecessary delays and raising concerns over matters already handled, SSA Pohar's actions placed extra stress and work on Ms. Amrein and made her look bad in front of other agencies.

86.     As a further act of discrimination and retaliation, Management gave Ms. Amrein an unfairly inaccurate adverse performance evaluation in February 2022.

87.     As a Special Agent, Ms. Amrein's duties include a variety of mental and physical abilities.  Her rating is based on factors listed in an annual self-assessment.

88.     Ms. Amrein's performance evaluation is based on a self-assessment and manager's discretion.  Once the SSA completes the evaluation, he forwards it to the front office for signature by a reviewing official (in this case, ASAC Rosado-Espinal).  After both sign it, they send it to Ms. Amrein for her signature.

89.     Ms. Amrein received a CJE score of 4.40 out of 5.

90.     Management downgraded Ms. Amrein in Element V, Business Results – Efficiency.

91.     This element has three performance aspects.  Management rated Ms. Amrein as "meets" for two of the three – Workload Management and Workload Implementation.  Not only did Ms. Amrein carry a full workload, but her duties were well beyond the normal course of business.  This includes, planning and executing a multi-agency, multi-site search warrant and rescue mission, coordinating victim protection and

interviews, and working outside of duty hours for an extended time, all while maintaining other cases. Within a week of the execution of this massive undertaking, Ms. Amrein also completed and submitted a closing package on a different case. Ms. Amrein never had issues with maintaining / properly storing her equipment, and stayed fully engaged in every aspect of her cases. Ms. Amrein produced cases from her General Investigation for the field office, finalized a different complex case, and assisted on the review process of the affidavit for the information with DOJ-Tax and the AUSA. Then Ms. Amrein worked with the AUSA to get the SW for a pen to find her target and led the successful arrest operation. There were other normal duties that Ms. Amrein continued to do, such as opening a new case, expanding the case, analyzing records, interviews, etc. All of this and more was able to be accomplished even with the delays caused and by being impeded, while on TRD.

92.     By contrast, Ms. Amrein's two prior annual performance evaluations, also rated by SSA Pohar, included a rating of "Outstanding" in Element V, with "exceeds" in these performance aspects even though Ms. Amrein did not assume such extensive duties and roles during those rating periods.

93.     In the mid-year review from July 2021, SSA Pohar even indicated in Element 5 that Ms. Amrein was "fully engaged with significant investigations in line with the annual business plan".

94.     The discriminatory/retaliatory annual evaluation kept Ms. Amrein from receiving a 4.6 or higher.

95.     Without receiving the 4.6 or higher, Management could not recommend Ms. Amrein for a QSI (quality step increase) which would have granted her a step increase (Ms.

Amrein would have gone from a 13 Step 7 to a 13 step 8), which impacts her salary for all future years.

96.     Management did not require all male agents to provide support for their rating.  However, Ms. Amrein had provided extensive support for her rating.  Management gave male agents in the Trenton POD ratings as high or higher than Ms. Amrein's without any support.

97.     In contrast, the Agency gave the female agents the lowest ratings.

98.     Management engaged in additional discriminatory and retaliatory actions.

99.     For example, since 2007, while in on-the-job training, Ms. Amrein had injured her knees.  Her left knee has been operated on twice.  She delayed operation on her right knee.

100.    While Ms. Amrein was experiencing the loss of sensation of pain as a result of the mandatory Covid vaccine as discussed above, Ms. Amrein's right knee was aggravated and swelled up after hiking and walking one weekend in October 2022.

101.    In March 2022, Ms. Amrein contacted Workers' Compensation and inquired about the process to get her knees reevaluated.  After being informed by Workers' Compensation representative Violet Miller that management would need to sign off on a new claim or to reopen an old claim, Ms. Amrein contacted ASAC Rosado-Espinal – the only unnamed management official in her original EEO complaint.

102.    Because SSA Pohar and SAC Montanez had already retaliated against Ms. Amrein and harassed her during the October/November 2021 incident, the ASAC was the only management official with whom Ms. Amrein felt comfortable discussing the matter.

103.    Accordingly, Ms. Amrein contacted the ASAC via email on March 29, 2022, to explain the issue.  In a call, Ms. Amrein explained that these injuries had not impaired her from performing her duties since the original events (more than 10 years earlier), and that she had fully participated in defensive tactics training with IRS-CI within the prior two weeks.

104.    In order to ease ASAC Roasdo-Espinal's mind that Ms. Amrein was not dealing with an impairment or something prohibiting her from performing her duties, Ms. Amrein sent her an email on March 30, 2022, giving her the option to have the specialist complete a Form CA-17 which is used by the Department of Labor during the workers' compensation process for determination of performing full duties.

105.    The ASAC contacted Violet Miller at Workers' Compensation and scheduled a conference call on March 30, 2022.  During this call, Violet Miller and her supervisor explained that they are not involved with the TRD process, but management needed to be involved with Ms. Amrein's new or reopened Workers' Compensation claim for her knees.  After the call, Violet Miller suggested in an email, with ASAC Rosado-Espinal copied on the email, that instead of using Form CA-17, to have the doctor provide Ms. Amrein a letter after reviewing her Special Agent duties.

106.    Instead of waiting a few days for Ms. Amrein's doctor's opinion, Ms. Amrein received an email later that night from the ASAC with SAC Montanez copied, that they required that Ms. Amrein complete Form 15326, Agent Self-Report Form, even though there was no new injury, and Ms. Amrein was simply going to her doctor for a reevaluation.

107.    Management made this demand without the benefit of checking with Labor Relations, which it did not do until the next day.

108.    Management was fully aware that Ms. Amrein's appointment with the specialist was scheduled for Monday, April 4, 2022 and she would know her diagnosis and prognosis at that time, yet Management still required Ms. Amrein to complete that form on Thursday, March 31, 2022 (the form specifically asks for the diagnosis and prognosis so Ms. Amrein was not able to include it).

109.    Management placed Ms. Amrein on TRD for a second time and contacted the Medical Review Officer (MRO) on Friday, April 1, 2022, only one hour prior to the end of Ms. Amrein's duty hours.

110.    Management also had agents come to Ms. Amrein's house at 5pm that night to retrieve her Government owned vehicle and weapon (2 hours after her normal duty hours), even though she would not be using them since she was on scheduled leave Monday, April 4, 2022 and Tuesday, April 5, 2022.

111.    The Agency treated Ms. Amrein differently than it treated male agents who went on TRD.  For example, on two separate occasions the Agency did not take weapons away from male agents who were put on TRD.

112.    Ms. Amrein saw Dr. Beth Shubin-Stein at the Hospital for Special Surgery on April 4, 2022, as scheduled.  Dr. Shubin-Stein expressed that she did not understand why Ms. Amrein would have been placed on restrictive duty, as there was no reason based on Ms. Amrein's physical abilities.  She explained that she would write a letter of clearance for Ms. Amrein to return to full duty.

113.     Because management took it upon themselves to notify the MRO on Friday, Ms. Amrein had to go through the process to be cleared from TRD.  Ms. Amrein contacted Comprehensive Health Services and informed them of her situation – they marked Ms. Amrein's case as a "priority" in order to get her cleared as soon as possible.

114.     The MRO reviewed the supporting documents Ms. Amrein faxed to them on April 5, 2022, and provided his clearance on April 6, 2022.  This clearance was sent to Labor Relations.   Ms. Amrein contacted Labor Relations and explained that SAC Montanez was leaving for an acting detail and to include Acting SAC Tammy Tomlins on the email regarding Ms. Amrein's clearance.  Labor Relations informed Ms. Amrein that they received the clearance from the MRO the night of April 7, 2022.

115.     Ms. Amrein emailed management on April 8, 2022, requesting her clearance letter once they received it.

116.     Labor Relations told ASAC Rosado-Espinal on Friday, April 8, 2022 that Ms. Amrein was cleared for full duty.  The Agency did not share this information with Ms. Amrein.

117.     Ms. Amrein still did not receive her clearance letter or return to duty memo by the morning of Tuesday, April 12, 2022.  Ms. Amrein emailed Acting SAC Tomlins with SSA Pohar and ASAC Rosado-Espinal copied on the email, again, asking for her clearance letter.   Ms. Amrein received her Return to Duty memo from the ASAC, approximately 30 minutes later.

118.     Ms. Amrein amended her pending EEO complaint to include the most recent TRD incident.  ASAC Rosado-Espinal was named in that EEO amendment.

20

119.    By being placed on TRD for this period, Ms. Amrein was not able to participate on two (2) warrants – one on April 7, 2022, and one on April 12, 2022. Management was aware of Ms. Amrein's commitment on these warrants prior to placing her on TRD.  Ms. Amrein had to call the case agent and on the job instructor for these two newer agents, and inform them that she was placed on TRD and would not be able to participate on their warrants.  This raised questions about Ms. Amrein's absence and did not reflect well on Ms. Amrein or the Agency.  On the warrant on April 7, 2022, Ms. Amrein was provided an important role of separating the girlfriend and her 3-year-old daughter from the boyfriend (target getting arrested), and provide them with a distraction, as to avoid unnecessary stress and memories on the child.  Agents were able to readjust their roles last minute on both warrants, to cover for Ms. Amrein.  A meeting on one of Ms. Amrein's cases with defense counsel, in order to discuss a criminal resolution, had to be postponed since Ms. Amrein was not able to make it to the meeting due to her TRD status.  Ms. Amrein was presenting to defense, and this meeting could not happen without her in-person involvement.

120.    During this time period concerning the knee issue, Ms. Amrein had asked ASAC Rosado-Espinal to exclude SSA Pohar and SAC Montanez from the discussion about Ms. Amrein's knee but she declined to do so.

121.    Management, per ASAC Rosado-Espinal, reprimanded Ms. Amrein telling Ms. Amrein that she is "disrespectful and unbecoming", and instructed her to work professionally with her management regardless of the EEO matter.  ASAC Rosado-Espinal also misrepresented facts by stating that she informed Ms. Amrein on March 30, 2022, that she was being placed on TRD during the call with workers' compensation, when in

actuality, workers' compensation specifically stated that TRD was to be discussed and determined by management and they would not be involved in that process.

122.    As further discrimination/retaliation, Management then issued Ms. Amrein a Letter of Admonishment because she had objected to being placed on TRD and because she expressed concern that her medical information would be shared with the management personnel she had accused of discrimination and retaliation.

123.    On May 3, 2022 at 11:00am, Acting SAC Tomlins and ASAC Rosado-Espinal held a meeting with Ms. Amrein at her office located in Trenton, NJ.  Acting SAC Tomlins introduced herself to Ms. Amrein just prior to the meeting.  At the start of the meeting, she informed Ms. Amrein that Ms. Amrein was being issued a Letter of Admonishment for unprofessional behavior. Ms. Amrein read the first paragraph and explained to her that the information listed was not factual and asked if she had seen the email chain or spoke with Violet Miller (the workers' compensation representative who was on the call).  She looked at Acting ASAC Rosado-Espinal, and then turned backed to Ms. Amrein and stated that she had not.  Ms. Amrein explained that the second paragraph was incomplete, and there was no context.  Acting SAC Tomlins said they would speak with Violet Miller and revise the letter.

124.    Management falsely accused Ms. Amrein of raising her voice and yelling.

125.    This punishment followed an email from Ms. Amrein in which she told ASAC Rosado-Espinal that involving SSA Pohar and SAC Montanez in her medical issues was objectionable because she had open EEO matters involving them.

126.    Ultimately, Management issued Ms. Amrein a revised Letter of Admonishment only a few hours later, which would not have allotted for enough time for the revised LOA to be reviewed by the proper department.

127.    Ms. Amrein's status as a woman, a person with a disabled status and/or prior protected activity, was a motivating factor in management's decision to issue the Letter of Admonishment (LOA).

128.    In the LOA management singled out the fact that Ms. Amrein objected to disclosing her medical information to personnel for whom she had open EEO matters as a reason to punish her.

129.    Ms. Amrein did not engage in discourteous behavior by asserting her medical privacy rights and her concern over targets of her EEO complaint being privy to her medical condition.

130.    The LOA was consistent with how Management had retaliated against Ms. Amrein during her first EEO when she objected to "G's" assault and the ensuing retaliation. For example, in October 2018 Management documented that Ms. Amrein had used an expletive, among other things.  However, male employees routinely used expletives but were not written up for doing so.

131.    Although the Agency settled Ms. Amrein's first EEO, SSA Pohar still used the earlier instances of retaliation such as the letter above to criticize Ms. Amrein during the second EEO investigation.

132.    Due to the LOA, Management told Ms. Amrein that her telework privileges were being suspended for a year.  By being unable to telework, Ms. Amrein would not have access to her computer in order to accomplish work during her free time during early

mornings or after normal duty hours.  Also, when she had doctor's appointments, Ms. Amrein would have to take a half day of leave instead of just an hour or two, because now Ms. Amrein would have to drive to the Trenton office, then at the start of her leave, drive home to swap cars, drive to her doctors, drive back home to swap cars, then drive back to the office before her leave ends.  Prior, Ms. Amrein had to just drive to her doctors then drive back home.

**COUNT I**

**(Title VII)**
**42 U.S.C Sec. 701 et. seq.,**
**42 U.S.C 2000e-16(a), et. seq.**
**GENDER DISCRIMINATION**

133.    Plaintiff incorporates herein each and every allegation stated above.

134.    As supported by the above stated allegations, Defendant discriminated against Plaintiff because of her gender, female.

135.    Following the sexual assault, the Agency's view of Ms. Amrein was that she did not conform to a sex stereotype, i.e., she did not play along with the assault committed by her male co-worker and this perception led the Agency to view Ms. Amrein in a negative manner.

136.    This gender discrimination includes the facts described above to include for example, Defendants' placing her on restricted duty, when similarly situated males were not placed on restricted duty and/or did not have to surrender the GOV or government weapon when placed on TRD, misrepresenting Ms. Amrein's performance in her evaluations which led to lower earnings but, at the same time, providing male employees with unjustified better ratings, and issuing Ms. Amrein a Letter of Admonishment which

24

was unjustified and criticized Ms. Amrein for making legitimate objections to management's actions that would not have been made to a man.

137.    All of these personnel actions favored personnel who were not female. These personnel actions were not made free from discrimination based on gender.  But for her gender Defendant would not have taken these adverse actions.  For example, a man who objected to being placed on restricted duty would not have received a letter of admonishment.

138.    As a result, Defendant's actions have caused Ms. Amrein to sustain and continue to sustain direct and consequential damages, including, but not limited to, emotional pain and suffering, mental anguish, humiliation and embarrassment, damage to her professional reputation and development, loss of future employment opportunities, bodily injury, lost salary and the impairment of future earning capacity, justifying an award of compensatory damages, the amount to be determined by a jury at trial.

**Count II**
**Title VII**
**42 U.S.C. § 2000e-3(a) et seq.**
**42 U.S.C. § 2000e-16(d), § 2000e-5(g)(2)(A)**
**Retaliation**

139.    Plaintiff incorporates herein each and every allegation stated above.

140.    Ms. Amrein engaged in protected activity when she objected to the sexual assault and in pursuing relief through the EEO process that raised the assault as well as several actions of discrimination and retaliation.  Ms. Amrein participated in the EEO process when she contacted a counselor and filed a formal EEO complaint and participated in the investigation from November 2021 through the present.  Ms. Amrein also engaged in protected activity when she objected to being placed on restricted duty.  SSA Pohar

laughed at Ms. Amrein when Ms. Amrein stated that she may have to file an EEO complaint due to Managements placement of TRD on Ms. Amrein, and the intentional delays that followed.

141.   Management expressed that they believed Ms. Amrein's EEO complaints were frivolous.

142.   Management felt that Ms. Amrein was creating a hostile environment for them because she accused it of EEO violations.

143.   In retaliation for these protected activities, Management took the retaliatory actions described in the factual section above.  These included placing Ms. Amrein on restricted duty on two occasions, downgrading her performance evaluation, not assisting her with investigations/execution of arrests, issuing an unjustified Letter of Admonition that specifically referenced Ms. Amrein's EEO activities and acknowledged Ms. Amrein's objection to being placed on TRD, and subsequent termination of Ms. Amrein's telework privileges and in justifying these actions by using earlier retaliatory acts against Ms. Amrein such as the unjustified criticism that Ms. Amrein used an expletive.

144.   These retaliatory actions all took place while Ms. Amrein was actively pursuing her EEO rights with full knowledge by Management that she was doing so.

145.   A reasonable person would be deterred from opposing discrimination and participating in the EEO process if they were subjected to such actions.

146.   As a result of Defendant's retaliation, Ms. Amrein has sustained and continues to sustain direct and consequential damages, including, but not limited to, emotional pain and suffering, mental anguish, humiliation and embarrassment, damage to her professional reputation and development, loss of future employment opportunities,

bodily injury, lost salary and the impairment of future earning capacity, justifying an award of compensatory damages, the amount to be determined by a jury at trial.

**COUNT III**
**29 USC sec. 791, et seq.**
**Disability Discrimination**
**Rehabilitation Act (29 U.S.C. 791 (f) as amended by American with Disabilities Act**
**(42 U.S.C. 12111, et seq. and 42 U.S.C. 12201-12204 and 12210)**

147.    Plaintiff incorporates herein each and every allegation stated above.

148.    The ADA prohibited the Agency from discriminating against Ms. Amrein in the terms, conditions and privileges of employment because it perceived her to be a person with a disability.  This discrimination includes, but is not limited to, situations where an employer limited, segregated or classified an employee in a way that adversely affects the opportunities or status of such employee because of the disability of such employee.

149.    Among other things, the ADA defines disability being regarded as having an impairment that substantially limits one or more major life activities of an individual. 42 U.S.C. 12201.

150.    An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

151.    The Agency perceived Ms. Amrein's numbness from the Covid vaccine to be a major impairment to her nervous system and that could last more than six months.

152.    The Agency perceived Plaintiff to have such a major disability that it could not let her work.

153.    As a result, due to this perceived disability the Agency discriminated against Ms. Amrein by putting her on restricted duty.

154.    Due to the Agency's perception of Ms. Amrein having a major disability the Agency took away Ms. Amrein's enforcement duties and relieved her of her government issued weapon and government owned vehicle.

155.    These actions prevented Ms. Amrein from doing her job and caused her embarrassment with her peers.

156.    In addition, the Agency perceived Ms. Amrein to be disabled when she reported an issue with her knees.

157.    The Agency viewed this as a major impairment in Ms. Amrein's ability to perform her job as a special agent and as evidenced by the Agency again placing Ms. Amrein on restricted duty.  The Agency perceived that this disability would last longer than six months.

158.    Management concluded that Ms. Amrein's condition was disqualifying from her job because it impaired full performance of the duties of the position.

159.    The Agency discriminated against Ms. Amrein because of perceived disability when it placed her on restricted duty and prevented her from performing her enforcement activities and took away her government issued weapon and government owned car.  Further, Management unreasonably delayed Ms. Amrein's return to work despite the fact that medical professionals had cleared her to return to work.

160.    As a result of Defendant's disability discrimination, Ms. Amrein has sustained and continues to sustain direct and consequential damages, including, but not limited to, emotional pain and suffering, mental anguish, humiliation and embarrassment, damage to his professional reputation and development, loss of future employment opportunities, bodily injury, lost salary and the impairment of future earning capacity, justifying an award of compensatory damages, the amount to be determined by a jury at trial.

**Count IV**
**Hostile Environment Based on gender, disability (perceived)**
**And/or protected activity (retaliation)**
**42 U.S.C. § 2000e-2(a) and § 2000e-16(a)**

161.    Plaintiff incorporates herein each and every allegation stated above.

162.    Defendant created a hostile environment for Ms. Amrein on a continuing basis through the actions of supervisors because of her gender and/or disability (perceived) and/or retaliation for her ongoing protected activity.   These actions included the items alleged in the factual section, e.g.:  placing Ms. Amrein on restricted duty on two occasions for disability (perceived), otherwise interfering with her work, making critical comments about her sexual assault complaint, issuing an unjustified Letter of Admonishment, taking away her telework privileges, relying on retaliatory criticisms from Ms. Amrein's first EEO complaint, among other things.  These actions took place over a very short time frame of about a year and had a deleterious emotional impact on Ms. Amrein.

163.    Management created these working conditions which were permeated with discriminatory intimidation, ridicule and insult that altered the conditions of Ms. Amrein's employment and created an abusive working environment.   For example, management

29

gave sworn statements where they criticized Ms. Amrein, who they knew was alleging sexual assault, and whose assaulter had been charged by a criminal complaint for same, as making frivolous complaints.  Management asserted that Ms. Amrein was "a habitual filer of frivolous EEO complaints."  Further, Management asserted that it was aware of the amount for which Ms. Amrein settled her first EEO complaint, which information it should not have.  Management claimed it was Ms. Amrein who was actually victimizing members of management with her accusations of discrimination and hostile work environment. Management was clearly creating and perpetuating an environment for Ms. Amrein in which her experience as a sexual assault victim was inconsequential and she should get over it; that the EEO process, which was supposed to be confidential, was not confidential and, further, Management was attempting to dissuade Ms. Amrein from utilizing the EEO process which is retaliatory per se.

164.    Management forbade Ms. Amrein from discussing her EEO matter while in the workplace.  Management concluded that Ms. Amrein discussing her EEO matters could create "a harassing and hostile environment for her co-workers."

165.    Further, Ms. Amrein was subjected to these conditions with knowledge that her assaulter was still being paid by the Agency while being limited to desk duty because he had been charged in a criminal complaint.  In addition, Ms. Amrein understood from a co-worker that management had been aware of the assaulter's violent propensities prior to her assault but had declined to warn Ms. Amrein of the danger and had placed her into the same dangerous situation that the Agency had placed the prior victim.  This combination of events led Ms. Amrein to believe the Agency was actively creating an unsafe and hostile work environment for female employees who objected to acts of sexual violence.

166.     But for Ms. Amrein's gender, disability (perceived) and/or protected activity, Defendant would not have subjected Ms. Amrein to this hostile environment.

167.     As a result of Defendant's creation of a hostile environment, Ms. Amrein has sustained and continues to sustain direct and consequential damages, including, but not limited to, emotional pain and suffering, mental anguish, humiliation and embarrassment, damage to her professional reputation and development, loss of future employment opportunities, bodily injury, lost salary and the impairment of future earning capacity, justifying an award of compensatory damages, the amount to be determined by a jury at trial.

**WHEREFORE**, Plaintiff requests judgment against the Defendant as follows:

a. Award her back pay.

b. enjoin defendant from engaging in discrimination and from retaliating against plaintiff for pursuing this action.

c.  direct and consequential damages; compensatory damages.

d.  award her costs and reasonable attorney's fees incurred in this action and the administrative claims that necessarily preceded it.

e. Pre-judgment interest.

f. Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

_____
Michael G. Kane, Esq. Bar No. 020362005
Cashdan and Kane, LLC
226 St. Paul Street
Westfield, NJ 07090
908-264-9331
Fax 908-654-7207
mkane@cashdankane.com

32